**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| DIANA V. GARCIA, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) CAUSE NO. 1:11-CV-00165 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## OPINION AND ORDER

Plaintiff Diana Garcia appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1]

(Docket # 1.)  For the following reasons, the Commissioner's decision will be REVERSED, and

the case will be REMANDED to the Commissioner for further proceedings in accordance with

this Opinion.

## I. PROCEDURAL HISTORY

Garcia was last insured for DIB on March 31, 2010.  (Tr. 13, 15.)  She applied for DIB in

September 2005, alleging disability from November 15, 2003.  (Tr. 54-56.)  Her claim was

denied initially and upon reconsideration (Tr. 37-39, 41-44), and Garcia requested an

administrative hearing (Tr. 36).  Administrative Law Judge ("ALJ") Terry L. Miller conducted a

hearing on June 18, 2008, at which Garcia, who was represented by counsel; Garcia's husband;

---

[1]All parties have consented to the Magistrate Judge.  (Docket # 12); *see* 28 U.S.C. § 636(c).

and a vocational expert ("VE") testified.  (Tr. 13, 706-65.)

On January 6, 2009, the ALJ rendered an unfavorable decision to Garcia, concluding that she was not disabled because she could perform a significant number of jobs in the national economy despite the limitations caused by her impairments.  (Tr. 13-23.)  The Appeals Council denied Garcia's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 2-4.)

Garcia filed a complaint with this Court on May 18, 2011, seeking relief from the Commissioner's final decision.  (Docket # 1.)  In her appeal, Garcia argues that the ALJ (1) failed to evaluate the opinion of Dr. Robert Doyal, her former psychologist; (2) improperly evaluated the opinions of Ms. Catherine Duchovic, her psychiatric nurse practitioner, and Dr. Daniel Nolan, her treating pain specialist; (3) improperly discredited her symptom testimony; and (4) erred at step five by not following SSR 00-4p and by relying on the VE's testimony.  (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 14-25.)

## II.  FACTUAL BACKGROUND[2]

### A.  Background

At the time of the ALJ's decision, Garcia was forty-one years old (*see* Tr. 21, 711), had obtained her high school equivalency degree (GED) and attended one year of college (Tr. 713), and had previously worked as an assembly line worker and waitress (Tr. 68, 103).  Garcia alleges that she became disabled as of November 15, 2003, due to insulin dependent diabetes mellitus with some evidence of neuropathy, retinopathy, neurogenic bladder, and nephropathy; hypertension; degenerative joint disease/fibromyalgia; obesity; hyperthyroidism and

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 765-page administrative record necessary to the decision.

hyperlipidemia; migraine headaches/cephalgia; major depressive disorder/bipolar disorder; and post-traumatic stress disorder.  (Opening Br. 2.)

### B.  *Garcia's Testimony at the Hearing*

At the hearing, Garcia stated that she lives with her husband and children.  (Tr. 712.)  She testified that she received her GED and attended Ivy Tech for about one year, but stopped because "[i]t was hard" and her "depression got worse."  (Tr. 713-14.)  When recounting her work history, Garcia indicated that she last worked two years ago as a press machine operator and parts inspector for a car parts manufacturer.  (Tr. 714-15.)  She reported that the job was supposed to be full time, but some weeks she did not work full time, and that she worked there for about four months until she quit because her depression and diabetes got worse and she was experiencing paranoia.  (Tr. 715.)  Garcia also worked as a waitress part time—about 15 or 20 hours a week—in 2004; that job apparently ended when the restaurant was sold.  (Tr. 715-16.)

Regarding her physical problems, Garcia reported suffering from diabetes, migraines, and fibromyalgia.  (Tr. 717.)  She testified that diabetes and fibromyalgia are her "primary" and most debilitating physical conditions (Tr. 718), but that she also gets severe migraines, rating at a pain level of ten, that—at least once or twice a month—put her in bed for a couple of days (Tr. 726).

As for her mental impairments, Garcia recalled being diagnosed with bipolar disorder in 2002 or 2003.  (Tr. 734.)  She described her symptoms as racing thoughts, difficulty concentrating, scratching herself or pulling her hair when she experiences a "depression with rage," seeing shadows, hearing voices calling her name, having bad nightmares, and becoming paranoid.  (Tr. 736-37, 740.)  In terms of treatment, Garcia saw Dr. Steve Schneider at Psychiatric Care starting around 2003; she discontinued her care with him because she "didn't

want to come out of [her] house" and "wanted to hide." (Tr. 734-35.) Upon questioning from her attorney, Garcia admitted that she had some problems with Dr. Schneider after he put her in the hospital because he thought she was going to kill herself or her son. (Tr. 748-49.) She subsequently saw Dr. Jay Patel, but had to stop seeing him once she lost her insurance. (Tr. 749.) She began going to Park Center in 2006, where she recalled seeing, among others, Ms. Catherine Duchovic, a nurse specialist, at least once, and sometimes twice, a month. (Tr. 735-36, 749-50.)

## C. The Vocational Expert's Testimony

An impartial VE also testified at the hearing.[3] (Tr. 699-705, 757-65.) The ALJ presented a series of hypotheticals to the VE. (Tr. 760-63.) The ALJ's first hypothetical posed to the VE a person of Garcia's age, education, and work history, who was limited to light work with several additional limitations, such as avoiding constant near or close visual acuity and exposure to brights lights, loud noises, or strong odors. (Tr. 760.) The VE stated that such a person could not perform any of Garcia's past relevant work, but could work as a garment bagger (approximately 1,400 jobs in the Fort Wayne area), laundry folder (approximately 200 to 250 jobs in the Fort Wayne area), and an inspector/hand packager (approximately 750 to 1,000 jobs in the Fort Wayne area).[4] (Tr. 760-61.) The ALJ then added an additional limitation to the hypothetical—that the individual must be given a sit/stand option. (Tr. 761.) The VE testified that this individual could still perform these three jobs. (Tr. 761.)

---

[3] Inexplicably, the certified transcript of the June 18, 2008, hearing in the record ends in the middle of the VE's testimony. (*See* Tr. 765.) What appears to be the rest of the transcript is included as an enclosure to Garcia's appeal of the ALJ's decision to the Appeals Council. (Tr. 699-705.)

[4] Because of noise restrictions, the VE later replaced the inspector/hand packager job with advertising material distributor (approximately 300 jobs). (Tr. 700-01.)

After concluding with his hypotheticals, the ALJ asked the VE if the "other jobs that [he] provided in the previous hypotheticals were consistent with the descriptions in the [Dictionary of Occupational Titles ("DOT")] and the [Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO")]." (Tr. 763.) The VE responded, "They are consistent with the DOT, with the exception of the sit/stand option, Your Honor. The DOT does not provide for a sit/stand option." (Tr. 763-64.)

Garcia's attorney then cross examined the VE (Tr. 699-705, 764-65), questioning the VE about how he arrived at the numbers for the jobs cited, particularly 1,400 for the bagger job. (Tr. 702-04.) The following exchange then took place:

> VE: That comes from the U.S. Bureau of Labor Statistics[.] [W]hat I look at is the metropolitan statistical area of Fort Wayne as provided by the federal government, Department of Labor, and that is where the number comes from.
>
> ATTY: Um, do they provide that information based upon like you gave a DOT number[?] [D]o they have a DOT number for that?
>
> . . .
>
> VE: It's usually listed as a SOC number.
>
> ATTY: And the SOC . . . would that include several other DOT jobs they divide into DOT jobs[?] . . .
>
> VE: Yes.
>
> ATTY: Okay . . . how do you separate out the number[?] [T]here's probably several thousand jobs in each classification[,] correct? How do you separate out the 1,400 from the other?
>
> VE: I would not agree that it's several thousand jobs. Uh, but what I would look at is how the job is performed. I look at the physical demands of the job. I look at the external levels of the job and if the job is similar in how it is performed it would be classified or grouped together and I would come up on a number based on that group.
>
> ATTY: Well okay the SOC classification includes several job titles.

VE: Yes.

ATTY: Okay, and it represents X number of jobs.

VE: Um hum.

ATTY: Okay, now so how do you get down to the . . . 1,400?

VE: Okay, again by looking at the unskilled, looking at the skilled, looking at all the jobs that are provided in the classification. I would look at the number of jobs that are available in the area as provided by the federal government and I believe the number that they have provided for that particular job was 1,430.

ATTY: Okay, and could you provide that information post hearing?

VE: That information is also available to you directly online from the U.S. Department of Labor[.]

ATTY: Well I think it is pretty clear that I am entitled to that information. Are you able to provide the underlying information?

VE: Yes, I'll provide that for you.

(Tr. 702-03.) At this point, the ALJ asked the VE to clarify what he was going to provide. (Tr. 703.) The VE responded that he would provide where he got the information from the U.S. Department of Labor in a statement form and that "that's all [he] can provide. Everything else is work product in terms of . . . looking at the numbers, looking at how the jobs are performed . . . ." (Tr. 703.) The ALJ then stated that the VE "gave his testimony as to how he arrived and the sources" and "the information with respect to the authorities he relied on and his methodology" and that he was "satisfied with [the VE's] testimony." (Tr. 704.) Garcia's attorney objected to the VE's testimony on this point. (Tr. 704-05.)

Garcia's attorney also asked the VE if the U.S. Bureau of Labor Statistics separates out part-time work from full-time work, to which VE responded in the affirmative—that part-time work is separated out. (Tr. 704.)

*D. Summary of the Relevant Medical Evidence*[5]

In May 2003, Garcia was evaluated at Psychiatric Care. (Tr. 489-93.) She was seeking treatment for depression and reported that she was experiencing mood swings, sadness resulting in sobbing, suicidal ideation, and an inability to sleep; feeling isolated, irritable, and easily angered to the point of wanting to hurt someone; and hearing voices and talking to them. (Tr. 489.) Garcia returned to Psychiatric Care in July; progress notes indicate that the voices eased up, that her mood improved, and that she was no longer suicidal, but that she could not sleep due to racing thoughts. (Tr. 488.)

In February 2005, Ms. Dian Sullivan, a social worker at Psychiatric Care in Dr. Schneider's office, saw Garcia. (Tr. 485-87.) Among other things, Garcia told Ms. Sullivan that she saw a "shadow" all the time telling her to go get a knife and harm her son; Ms. Sullivan wanted her to be assessed that day at the hospital for possible admittance. (Tr. 486.) After Garcia did not go to the hospital, the police were notified (Tr. 485-86), and they brought Garcia into the hospital (Tr. 604). She was admitted and then discharged two days later. (Tr. 605.) At discharge, she was stable, but had some depressive and mood symptoms; her diagnosis was depressive disorder, not otherwise specified, and she was assigned a Global Assessment of Functioning ("GAF") score of "around 50."[6] (Tr. 605.)

---

[5] As the Court's decision is based only on Garcia's mental impairments, only the relevant medical evidence regarding those impairments is set forth below.

[6] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers). *Id.*

Several months later, in August 2005, Garcia was seen by Dr. Jay Patel of Hobson Psychiatric Services. (Tr. 595-96.) She reported being depressed, hearing voices, not sleeping, crying, and experiencing headaches. (Tr. 595.) Dr. Patel diagnosed her with major depression, recurrent type with psychotic features, and assigned her a GAF of "probably 50." (Tr. 596.)

Later that month, Garcia returned to Psychiatric Care, where she saw Robert Doyal, Ph.D. (Tr. 484.) She reported that she had been very depressed and crying daily; had no energy; and was unable to sleep, but very fatigued. (Tr. 484.) Progress notes indicate she had experienced "hypomanic/manic episodes." (Tr. 484.) At the end of August, Ms. Elizabeth McGee, a psychiatric nurse practitioner at Psychiatric Care, saw Garcia for a medication management appointment. (Tr. 481.) Ms. McGee noted that Garcia continued to struggle with some depressive symptoms, amotivation related to daily activities, and interrupted sleep. (Tr. 481-82.) Garcia saw Dr. Doyal again the following day. (Tr. 484.) She reported spending a lot of money gambling and acknowledged occasional feelings of rage. (Tr. 484.) A week later, she told Dr. Doyal she was feeling "really sad" and that she had decreased energy and motivation; she further related that she was hearing voices, like someone calling her name. (Tr. 483.) The next day, she repeated to Ms. McGee that she was hearing voices, but stated that she was not suicidal, just more depressed with low energy. (Tr. 483.)

In October 2005, Dr. Doyal completed a Report of Psychiatric Status at the request of the Social Security Administration ("SSA"). (Tr. 495-501.) The report indicated that Garcia was first seen on May 22, 2003. (Tr. 495.) Dr. Doyal noted that her diagnosis was bipolar disorder, her current GAF was a 45, and her highest-past-year GAF was a 60. (Tr. 495.) Dr. Doyal reported that Garcia's symptoms of depression started about four to five years ago and include

isolating herself in her bedroom for a few days at a time. (Tr. 497.) He further related that she has a past history of delusional (paranoid) thoughts and suicidal/homicidal ideation, but none currently, and experiences mood swings including hypomania. (Tr. 497.) Dr. Doyal then opined that it would be difficult for Garcia to work on a regular basis due to chronic migraines and intermittent depression and that her ability to attend to a simple work routine on a consistent basis was "[v]ery limited due to emotional and physical lability." (Tr. 499.) He further noted that she has not required hospitalization since February 2005, "although her mood is still very labile," and that her psychosis was under "better control." (Tr. 500.)

Also in October of 2005, Dr. K. Neville, a state agency psychologist, completed a "Psychiatric Review Technique" (Tr. 452-65) and a "Mental Residual Functional Capacity Assessment" (Tr. 466-69) on Garcia. In the psychiatric review, Dr. Neville concluded that she suffered from major depression. (Tr. 455.) After assessing Garcia's mental residual functional capacity, Dr. Neville found that Garcia retains the capacity to carry out simple, repetitive tasks in a competitive setting. (Tr. 468.) A second state agency psychologist later affirmed this assessment on April 3, 2006. (Tr. 468.)

Later on in April 2006, Garcia returned to Park Center seeking assistance for depression symptoms and increasing irritability manifesting in anger outbursts. (Tr. 306.) She also reported seeing shadows that scared her, but denied homicidal or suicidal thoughts. (Tr. 306, 308.) Regarding her past treatment, Garcia indicated that Dr. Schneider of Psychiatric Care previously diagnosed her as bipolar and that she was under his care and taking medication, but had to stop treatment because she ran out of insurance. (Tr. 306.) She further stated that she had not been taking any of her medications for the last year, but that she wanted to get back on them. (Tr.

306, 309.)  She was diagnosed with bipolar I disorder, most recent episode unspecified, and assigned a GAF of 55.  (Tr. 308.)

Garcia was evaluated at Park Center again in May.  (Tr. 304-05.)  The assessment form indicates that Garcia had been going without sleep, was agitated, had been scratching her arms, had very high mood swings, had been hearing voices, and was seeking help.  (Tr. 304.)  Garcia was restarted on her medications and assigned the same diagnosis and GAF as the prior month. (Tr. 305.)  In June, her Park Center treatment team again assigned her this same diagnosis and GAF.  (Tr. 301.)  A treatment plan completed in September indicated that she had started the review period with suicidal ideation and extreme depression, but recent changes had decreased her depression symptoms and she had no current reports of suicidal ideation.  (Tr. 300.)  By December, Garcia reported having periods of mania and depression and that she had signed a "no harm" contract due to suicidal ideation in October.  (Tr. 299.)

In March 2007, Garcia's diagnosis remained the same, but her Park Center treatment team assigned her a GAF of 49.  (Tr. 296.)  She was showing positive progress in her treatment. (Tr. 298.)  Two months later, at the end of May, her GAF score remained the same as in March, and she reported improvement in mood management.  (Tr. 293, 295.)  By August, there was still no change in Garcia's GAF score; she reported having periods of instability at the beginning of the review period, but that she had been very stable toward the end.  (Tr. 290, 292.)  In November, Garcia's GAF remained the same; the treatment plan indicates that she had shown recent progress, but had episodes of increased depression and anxiety.  (Tr. 286, 288.)

In February 2008, Garcia saw Catherine Duchovic at Park Center.  (Tr. 217-20.)  She told Ms. Duchovic that she had ran out of her medications for two weeks because she refused to leave

her home in a depressed state. (Tr. 219.) Garcia further reported that she had been having bad dreams, feeling anxious and jittery, experiencing recurrent paranoia, and could not sleep. (Tr. 219.) Ms. Duchovic noted that Garcia had missed medication reviews and her mood group meetings. (Tr. 219.) Garcia returned to Ms. Duchovic in June. (Tr. 144-46.) Ms. Duchovic found her treatment response improved; Garcia reported improvement from medication changes and that she was sleeping without nightmares. (Tr. 145-46.)

That same month—June 2008—Ms. Duchovic completed a "Mental Impairment Questionnaire" (Tr. 148-51) and "Medical Source Statement" (Tr. 152-53) for the SSA. On the questionnaire, Ms. Duchovic indicated that she had reviewed Garcia's records from Dr. Schneider and Hobson Psychiatric Services. (Tr. 148.) She diagnosed Garcia with bipolar I disorder, mixed with psychotic features, and assigned her a current and highest-past-year GAF of 49. (Tr. 148.) When describing the clinical findings that demonstrate the severity of Garcia's mental impairment and symptoms, Ms. Duchovic wrote that Garcia does fairly well on her medications with supportive therapy, but then has periods of deterioration with significant psychiatric instability; that her sleep is often impaired with racing thoughts or intrusive nightmares; that her mother's death resulted in increased depression, anger, and inability to cope, such that she gouged at the skin on her chest with her nails and left marks for weeks; that she was unable to consistently modulate her emotional responses; and that she has had paranoid thoughts and auditory hallucinations, but has none currently. (Tr. 149.) Ms. Duchovic further stated that Garcia could not deal with stressors. (Tr. 149-50.) Ultimately, Ms. Duchovic opined that Garcia would likely be absent from work more than four days a month and that if she returned to work full time, her mental functioning would decrease. (Tr. 150-51.)

11

In her medical source statement, Ms. Duchovic found that Garcia had a poor ability—meaning no useful ability to function—to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods of time; perform activities within a schedule, maintain regular attendance, and be punctual; work with or near others without being distracted by them; make simple work-related decisions; complete a normal workday or workweek; and perform at a consistent pace. (Tr. 152.) The medical or clinical findings Ms. Duchovic identified as supporting this assessment were Garcia's "severe mood lability despite meds"; her refusal at times to leave home to pick up her medications or attend group therapy due to her depression, periods, paranoia, and anxiety; her racing thoughts and nightmares that affect sleep; and her tendency to become agitated. (Tr. 152.) Ms. Duchovic also determined that Garcia had a poor ability to respond appropriately to changes in the work setting because her mood and affect were variable; sometimes she would be very bright and energized with good hygiene, and other times she would avoid visits due to increased depression and anxiety. (Tr. 153.) Ms. Duchovic noted that she would force herself out of bed when she is depressed, but would not leave the house. (Tr. 153.) She further stated that Garcia's stress and depression impair her concentration. (Tr. 153.)

A treatment plan for Garcia completed the following month contained a diagnosis of bipolar I disorder, most recent episode mixed, severe with psychotic features, and assigned her a GAF of 49. (Tr. 138-41.) The plan indicates that while Garcia had made progress in identifying issues, she still has mood swings where she does irrational things. Garcia saw Ms. Duchovic again a few days later. (Tr. 134-37.) Ms. Duchovic opined that her treatment response was worse and that although her depression was more stabilized and she was sleeping without

nightmares, her irritability was increasing again.  (Tr. 135-36.)

## III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).  Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded."  *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record, but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's.  *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive.  *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision.  *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### A.  The Law

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[7] *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, with respect to steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On January 6, 2009, the ALJ rendered his decision. (Tr. 13-23.) At step one of the

---

[7] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

analysis, the ALJ found that Garcia had not engaged in substantial gainful activity since her alleged onset date. (Tr. 15.) The ALJ then concluded at step two that Garcia suffered from the following severe impairments: insulin dependent diabetes mellitus with some evidence of neuropathy and retinopathy; degenerative joint disease/fibromyalgia; obesity; hyperthyroidism and hyperlipidemia; migraine headaches/cephalgia; major depressive disorder/bipolar disorder; and post-traumatic stress disorder. (Tr. 15.) Nonetheless, at step three, the ALJ determined that Garcia's impairment or combination of impairments did not met or medically equal a listing. (Tr. 16.) Before proceeding to step four, the ALJ determined that Garcia's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with the following RFC:

> [T]he claimant had the residual functional capacity to perform light work as defined in 20 CFR [§] 404.1567(b) except that the claimant needed a sit/stand option (where the individual can occasionally change positions throughout the eight hour work day, but can remain attentive to the task at hand); only occasionally climb ramps and stairs, balance, stoop, kneel, and crouch; never climb ladders, ropes or scaffolds; no constant or near or close visual acuity; no exposure to bright lights, loud noises, or strong odors. The claimant was also limited to simple, repetitive tasks; no fast-paced or strict production requirements; few, if any, workplace changes; and only occasional and brief interactions with others.

(Tr. 17.)

Moving onto step four, the ALJ found that Garcia was unable to perform any past relevant work. (Tr. 21.) At step five, however, the ALJ determined that Garcia could perform a significant number of jobs within the economy, including garment bagger, laundry folder, and advertising material distributor. (Tr. 22.) Thus, Garcia's claim for DIB was denied. (Tr. 23.)

### C. The ALJ Erred by Failing to Evaluate Dr. Doyal's Opinion

Garcia's first challenge to the ALJ's decision is that the ALJ improperly evaluated the

opinion of Dr. Doyal, her former psychologist at Psychiatric Services. (Opening Br. 14-15.) Ultimately, Garcia's argument has merit, necessitating a remand.

The Seventh Circuit Court of Appeals has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. § 404.1527(c)(2). However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); 20 C.F.R. § 404.1527(c)(2).

In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(c); *see Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).

Of course, contrary to many eager claimants' arguments, a claimant is not entitled to disability benefits simply because his treating physician states that he is "unable to work" or "disabled." *Clifford*, 227 F.3d at 870. The determination of disability is reserved to the Commissioner. *Id.*; *see Dixon*, 270 F.3d at 1177; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir.

1995); 20 C.F.R. § 404.1527(d)(2).  But, although "treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance," "opinions from any medical source on issues reserved to the Commissioner must never be ignored."  SSR 96-5p, 1996 WL 374183; *see also Frobes v. Barnhart*, 467 F. Supp. 2d 808, 819 (N.D. Ill. 2006).  Rather, the Commissioner must "evaluate every medical opinion [it] receive[s]."  20 C.F.R. § 404.1527(c).  "In evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 C.F.R. [§] 404.1527[c] . . . ."  SSR 96-5p, 1996 WL 374183; *see also Frobes*, 467 F. Supp. 2d at 819.  Regardless of the outcome, the Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion.  *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. § 404.1527(d)(2).

Here, in October 2005, Dr. Doyal noted that Garcia had depressive symptoms that included isolating herself in bed for a few days at a time and opined that it would be difficult for her to work on a regular basis due to chronic migraines and intermittent depression and that she would be very limited in her ability to attend to a simple work routine on a consistent basis "due to emotional and physical lability."  (Tr. 497, 499.)  Despite the ALJ's own recognition that Dr. Doyal was a "*treating* mental health source," the only mention the ALJ made of Dr. Doyal's opinion was in his evaluation of Ms. Duchovic's opinion.  (Tr. 20 (emphasis added).)  And, in this context, the ALJ only mentioned one portion of Dr. Doyal's opinion—namely that Garcia's psychotic symptoms were under "fair" control with anti-psychotic medications.  (Tr. 20.)  The ALJ never mentioned Dr. Doyal's opinions regarding Garcia's limited abilities to work due to chronic migraines and intermittent depression or consistently complete a simple work routine because of her emotional and physical lability.

Although the ALJ need not discuss or make a written evaluation of every piece of evidence, he may not select and discuss only that evidence which favors his ultimate conclusion or ignore an entire line of evidence that is contrary to the ruling. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *Anderson v. Astrue*, No. 1:10-cv-00587-SEB-MJD, 2011 WL 3739257, at *4 (S.D. Ind. Aug. 23, 2011); *Spencer v. Astrue*, No. 1:07-CV-00131, 2008 WL 1836669, at *6 (N.D. Ind. Apr. 22, 2008). Rather, the ALJ must review the record fairly and must articulate, at least at some minimal level, his analysis of the evidence to allow this Court to trace the path of his reasoning and to be assured that he considered the important evidence. *Diaz*, 55 F.3d at 307; *see Herron*, 19 F.3d at 333. Accordingly, "[a]n ALJ's failure to consider an entire line of evidence falls below the minimal level of articulation required," *Diaz*, 55 F.3d at 307, and makes it impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence, *Golembiewski*, 332 F.3d at 917. When the ALJ fails to mention probative evidence, the Court is further left to wonder whether it was even considered. *Spencer*, 2008 WL 1836669, at *7 (citing *Brindisi*, 315 F.3d at 786); *see Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000) (stating that the ALJ's failure to discuss a physician's report "in its entirety prevents this court from tracking the ALJ's reasons for discounting it").

Although the ALJ here did mention Dr. Doyal's opinion, he did so selectively. He briefly referenced Dr. Doyal's notation that Garcia's psychosis was "under better control"—and apparently interpreted this as Garcia's psychosis being under "fair" control—but ignored Dr. Doyal's repeated statements that Garcia's mood and emotions were labile (Tr. 497, 499-500)—one of which appears directly before his opinion on psychosis (Tr. 500 ("Has not required

hosp[italization] since Feb '05 although mood is still very labile; psychosis under better control."))—and his analysis of how this mood variability would affect Garcia's ability to work (*see* Tr. 499 (opining that Garcia's ability to attend to a simple work routine on a consistent basis would be "very limited due to emotional and physical lability")).

Furthermore, in relying on Dr. Doyal's statement in October of 2005 that, at that point, Garcia's psychosis was under better control and ignoring Dr. Doyal's opinions regarding the variability of Garcia's conditions, the "ALJ demonstrated a fundamental, but regrettably all-too-common, misunderstanding of mental illness. . . . [A] person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citations omitted). At the same time, the ALJ impermissibly engaged in a selective review of Dr. Doyal's opinion, *see Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) ("An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability." (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009))); *Myles*, 582 F.3d at 678 ("An ALJ may not selectively consider medical reports, especially those of treating physicians . . . . It is not enough for the ALJ to address mere portions of a doctor's report." (citations omitted)), which warrants a remand. And while the Commissioner argues that the portions of Dr. Doyal's opinion that the ALJ did not mention amount to issues reserved to the Commissioner (Def.'s Mem. in Supp. of Comm'r's Decision ("Def.'s Mem.") 14), even if this is true, such opinions must never be ignored. SSR 96-5p; *see also Frobes*, 467 F. Supp. 2d at 819.

Moreover, the ALJ himself acknowledged Dr. Doyal as a "prior *treating* mental health source" (Tr. 20 (emphasis added)), yet failed to apply any of the checklist factors to his opinion

or explain the weight given to it as the regulations require. *See Moss*, 555 F.3d at 561; *Bauer*, 532 F.3d at 608; 20 C.F.R. § 404.1527(c). Even if Dr. Doyal was not properly considered a treating psychologist, the Commissioner must evaluate every medical opinion received and, unless controlling weight is given to a treating source's opinion—which it was not in this case—he must consider the checklist factors in deciding the weight given to that opinion. *See Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Spencer*, 2008 WL 1836669, at *6; 20 C.F.R. § 404.1527(c).

And Dr. Doyal's opinion is particularly important as it is the only report in the record from a psychologist who actually treated Garcia before 2006.[8] *Cf. Rubio v. Astrue*, No. 10 C 6529, 2011 WL 3796755, at *10 (N.D. Ill. Aug. 24, 2011) (affirming ALJ's finding that claimant was not disabled when, among other things, "there [was] no contemporaneous treating physician's opinion in the record that Claimant was disabled at the time she was eligible for disability insurance benefits"). As such, the ALJ's failure to specifically evaluate Dr. Doyal's opinion, which contains conflicting evidence suggesting her disability, is not harmless. *See Walters v. Astrue*, 444 F. App'x 913, 917 (7th Cir. 2011) (unpublished) ("[W]hen there is reason to believe that an ALJ ignored important evidence—as when an ALJ fails to discuss material, conflicting evidence—error exists."); *Skarbek v. Barnhart*, 390 F.3d 500, 5004 (7th Cir. 2004) (concluding that an error is harmless when it "would not affect the outcome of the case").

In defense of the ALJ's decision, the Commissioner argues that Dr. Doyal made a general opinion based on both Garcia's mental and physical impairments, the latter of which he was not

---

[8] As a matter of fact, Dr. Doyal's report indicates that Garcia was first seen in May 2003, before her alleged onset date. (Tr. 495.) This would appear to be the first time Garcia was seen at Psychiatric Care (*see* Tr. 489), though not by Dr. Doyal.

qualified to make. (Def.'s Mem. 12.) However, "[t]he first problem with [the Commissioner's] argument is that the ALJ did not make it. '[P]rinciples of administrative law require the ALJ to rationally articulate the grounds for her decision and confine [judicial] review to the reasons supplied by the ALJ.'" *Blom v. Barnhart*, 363 F. Supp. 2d 1041, 1059 (E.D. Wis. 2005) (quoting *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002)); *see also Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("We have made clear that what matters are the reasons articulated *by the ALJ*." (emphasis in original)); *Phillips v. Astrue*, 413 F. App'x 878, 883 (7th Cir. 2010) (unpublished) ("We confine our review to the reasons offered by the ALJ and will not consider post-hoc rationalizations that the Commissioner provides to supplement the ALJ's assessment of the evidence."). As such, the Commissioner cannot prevent a remand based on this impermissible post-hoc argument.

### D. The ALJ Should Reconsider Ms. Duchovic's Opinion on Remand

Next, Garcia argues that the ALJ improperly evaluated the opinion of Ms. Duchovic, her treating psychiatric nurse practitioner at Park Center. (Opening Br. 15-19.) Ms. Duchovic opined in June 2008 that Garcia had no useful ability to perform activities within a schedule, maintain regular attendance, and be punctual, which she partially supported by noting Garcia's severe mood lability despite medications; would miss more than four days a month due to her mental impairments; was unable to deal with stressors; and would likely experience a decrease in mental functioning if she returned to full-time work. (Tr. 150-52.)

The ALJ discounted Ms. Duchovic's opinion, and ultimately assigned greater weight to the opinion of the state agency psychologists, because (1) Ms. Duchovic, who was not a medical doctor or licensed psychologist, was not an acceptable treating medical source; (2) Ms. Duchovic

did not see or treat Garcia before 2006; (3) a prior treating source—Dr. Doyal—stated that her psychosis was under fair control; (4) Garcia continued to work part time in 2004 and 2005, which suggested she had some capacity to work despite her physical and mental impairments; (5) Ms. Duchovic did not explain or justify her opinion that Garcia would miss more than four days of work per month; and (6) the state agency psychologists were able to review other evidence in the record that was not available to Ms. Duchovic and their opinion contradicted hers. (Tr. 20.) Because some of these reasons appear to be dubious—and the case is already being remanded—the ALJ should reconsider this opinion on remand.

As a psychiatric nurse practitioner, Ms. Duchovic is considered an "other source" under the regulations. *Furlow v. Astrue*, No. 10-554-CJP, 2011 WL 3555726, at *6 (S.D. Ill. Aug. 11, 2011); *Dogan v. Astrue*, 751 F. Supp. 2d 1029, 1038 (N.D. Ind. 2010); *see* SSR 06-03p, 2006 WL 2329939. Opinions from "other sources" should be evaluated using the applicable factors set forth in 20 C.F.R. § 404.1527 for weighing medical opinions from "acceptable medical sources." SSR 06-03p, 2006 WL 2329939. However, "[n]ot every factor for weighing opinion evidence will apply in every case." *Id*. The evaluation of an opinion from an "other source" "depends on the particular facts in each case." *Id*. Therefore, "[e]ach case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case." *Id*. Although the fact that a medical opinion is from an "acceptable medical source" may justify giving that opinion greater weight than an "other source opinion," in some cases, after applying the checklist factors, "an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' . . ." *Id.*

Here, the ALJ noted that Ms. Duchovic was not an acceptable treating medical source and then immediately concluded that "[t]his diminishes the weight to be given this opinion." (Tr. 20.)  An ALJ cannot entirely dismiss the medical opinion of an "other source" simply because he or she is not a doctor; the ALJ is still required to evaluate such an opinion.  *Wyatt v. Astrue*, No. 1:11-cv-00874-MJD-JMS, 2012 WL 2358149, at *6 (S.D. Ind. June 20, 2012) (citing SSR 06-03p, 2006 WL 2329939).  While the ALJ here did go on to evaluate Ms. Duchovic's decision, at least one of the reasons the ALJ discounted it is suspect.  Specifically, the ALJ gave greater weight to the opinions of the state agency psychologists than Ms. Duchovic partly because they "had the opportunity to review other evidence in the record that was not available to Ms. Duchovic."  (Tr. 20.)  But, in her questionnaire, Ms. Duchovic indicated that she had reviewed Garcia's records from Dr. Steven Schneider (of Psychiatric Care) and Hobson Psychiatric Services.  (Tr. 148.)  This would appear to include at least the notes from Dr. Doyal, who was also at Psychiatric Care—albeit, possibly not his report.  Regardless, the ALJ does not identify which evidence the state agency psychologists had that Ms. Duchovic did not.

Moreover, it would appear that Ms. Duchovic actually had *more* evidence than the state agency psychologists as she rendered her opinion in June 2008 (Tr. 151)—and therefore would have had Garcia's Park Center records—and the state agency psychologists last reviewed the file over two years before, on April 3, 2006 (with Dr. Neville's assessment opining as of October 2005) (Tr. 468); as such, the state agency psychologists would not have had any of Garcia's Park Center records because she began treatment there after their last review (Tr. 306 (noting that Garcia's initial assessment at Park Center was on April 20, 2006)).  Since the ALJ was specifically considering the amount of evidence the sources had before them when developing

23

their opinions, the ALJ should have considered that Ms. Duchovic's opinion—while not from an "acceptable medical source"—"was the most recent [mental health] professional word on [Garcia's] mental impairments, by a treating [psychiatric nurse practitioner] who had seen her repeatedly over [at least several months] with full access to her complete medical record to that point." *Jelinek*, 662 F.3d at 812. Accordingly, the ALJ should re-evaluate Ms. Duchovic's opinion on remand.

### E. The ALJ Should Readdress Step Five on Remand

Because a remand is warranted based on the ALJ's improper consideration of Dr. Doyal's opinion, the Court does not need to reach her remaining arguments. Nevertheless, after a cursory review, Garcia's challenges to the ALJ's step five finding—that the ALJ erred by not following SSR 00-4p and by relying on the VE's testimony as he failed to provide a proper foundation for the number of jobs cited (Def.'s Mem. 23-25)—suggest that the ALJ should also readdress step five on remand.

Regarding Garcia's first challenge, under SSR 00-4p, "the ALJ has an 'affirmative responsibility' to ask if the VE's testimony conflicts with the DOT, and if there is an 'apparent conflict,' the ALJ must obtain a reasonable explanation." *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (quoting SSR 00-4p, 2000 WL 1898704). While the Commissioner cites *Zblewski v. Astrue*, 302 F. App'x 488, 494-95 (7th Cir. 2008) (unpublished), for the proposition that because "the DOT does not address the subject of sit/stand options, it is not apparent that the testimony conflicts with the DOT" (Def.'s Mem. 24 (quoting *Zblewski*, 302 F. App'x at 494)), that case is distinguishable as here, unlike in *Zblewski*, the VE specifically testified that the jobs he cited were "consistent with the DOT, *with the exception of the sit/stand option*" (Tr. 763-64

(emphasis added)).  Because the VE explicitly noted the conflict, it should have been resolved.

*See Teskey v. Astrue*, No. 1:10-cv-00758-JMS-MJD, 2011 WL 1636924, at \*8 (S.D. Ind. Apr.

29, 2011) ("The conflict [between the sit/stand option and the DOT], if one exists is a latent one

only; therefore, ALJs needn't resolve it at the hearing if no one notices it."); *cf. Abbott v. Astrue*,

No. 08-2177, 2009 WL 3763990, at \*2-3 (C.D. Ill. Nov. 10, 2009) (holding that the ALJ

satisfied his obligation under SSR 00-4p when he asked the VE whether his testimony was

consistent with the DOT and the VE responded that it was).

Furthermore, the ALJ states in his decision that the VE "testified based upon his

experience and personal observations of the jobs cited, out of the total numbers of these jobs in

the region, they could be performed with a sit/stand option in the numbers cited above in this

decision.  These numbers had to be adjusted downward from the raw numbers in the Census and

SOC data because those sources did not contain information about accommodations for a

sit/stand option . . . ."  (Tr. 22.)  But, according to the hearing transcript in the record, the VE did

not so testify; rather, the VE gave those numbers (1,400 garment bagger jobs, 200 to 250 laundry

folder jobs, and 750 to 1,000 inspector/hand packager jobs, later replaced by 300 advertising

material distributor jobs) in response to the ALJ's first hypothetical, which did not include a

sit/stand option.  (Tr. 760-61).  When the ALJ included the sit/stand option, the VE confirmed

that these three jobs could be performed, but did not reduce the numbers or explain his

reasoning.  (*See* Tr. 761.)

This relates to Garcia's second challenge to the ALJ's step five finding—that the VE did

not provide a proper foundation for the number of jobs cited.  When the basis of the VE's

conclusions is questioned at the hearing, the ALJ should make an inquiry (similar to that of

Federal Rule of Evidence 702) to determine whether the VE's conclusions are reliable.  *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002).  "A vocational expert is 'free to give a bottom line,' but the data and reasoning underlying that bottom line must be 'available on demand' if the claimant challenges the foundation of the vocational expert's opinions."  *McKinnie v. Barnhart*, 368 F.3d 907, 911 (7th Cir. 2004) (quoting *Donahue*, 279 F.3d at 446).

Here, it is questionable whether the VE's data and reasoning were "available on demand."  Initially, the VE agreed to provide the underlying information (Tr. 703), but the ALJ stated that providing documentation was not necessary because the sources the VE used—the DOT and the SOC—were available to anyone online and the VE "gave his testimony as to how he arrived and the sources" (Tr. 703-04).  But Garcia's counsel also demanded the VE's work product and the underlying information.  (Tr. 703-04.)  And, as the Seventh Circuit reiterated in *Britton v. Astrue*, 521 F.3d 799, 803-04 (7th Cir. 2008), "the data underlying a VE's testimony must be available on demand to facilitate cross-examination and testing of the VE's reliability."  Here, Garcia's attorney had absolutely no data from which to cross-examine the VE, because, while the VE testified as to the sources he used, he "provided no data or citations for the references he relied upon in forming [his] opinion."  *McKinnie*, 368 F.3d at 909; *see also Denham v. Barnhart*, No. 05 C 3128, 2006 WL 4097284, at *2-3 (N.D. Ill. May 23, 2006) (remanding the ALJ's step five determination where the plaintiff challenged the VE's bottom-line testimony about the number of jobs available to plaintiff and the VE failed to provide to plaintiff the data supporting his testimony).[9]  Accordingly, on remand, the ALJ should readdress

---

[9] Moreover, it appears as though the VE was operating under at least some incorrect information. (*Compare* (Tr. 704) (where the VE testified that the U.S. Bureau of Labor Statistics separates out part-time work from full-time work), *with* (Tr. 64) (letter from the U.S. Census Bureau indicating that the census bureau data does *not* distinguish full-time and part-time work).)

step five, affirmatively resolving any conflicts and, if the VE's conclusions are again challenged, making a further inquiry to determine whether they are reliable.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED for further proceedings in accordance with this Opinion.  The Clerk is directed to enter a judgment in favor of Garcia and against the Commissioner.

SO ORDERED.

Enter for this 1st day of August, 2012.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge